UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| PEGGY S. EARNEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-714-JDT-TAB |
| | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY REVIEWING COMMISSIONER'S[1] DECISION[2]**

This action is before the court on Plaintiff Peggy Earnest's Complaint seeking

judicial review of the denial of Plaintiff's application for disability insurance benefits

under the Social Security Act.  Ms. Earnest claims that she is disabled due to

fibromyalgia, arthritis, recurrent trochanteric bursitis with bilateral hip pain, and

autoimmune sensorineural hearing loss.

**I.      Background and ALJ's Decision**

**A.      Hearing Before the ALJ and Background**

Ms. Earnest was born on February 22, 1958, and was 47 years old at the time of

_____

[1]  On February 12, 2007, Michael J. Astrue became the Commissioner of Social
Security.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he is substituted for
Commissioner Jo Anne B. Barnhart as the defendant in this suit.

[2]  This Entry is a matter of public record and will be made available on the court's web
site.  However, the discussion contained herein is not sufficiently novel to justify commercial
publication.

her hearing before the ALJ.  (R. 13, 60.)[3]  She holds an associate degree from Ball State University and has attended beauty school.  (R. 84.)  Ms. Earnest last worked as a secretary in a church office and was released from that position on April 21, 2002. She also worked as a beautician out of her home as recently as 1997.  (R. 78-79.)

On December 16, 2003, Ms. Earnest filed an application for disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 423, claiming disability due to fibromyalgia and alleging an onset date of April 21, 2002, the same date that she stopped working.  (R. 66, 77-79.)  The Social Security Administration denied her request initially and on reconsideration.  Ms. Earnest then sought and received a hearing before an Administrative Law Judge.

Administrative Law Judge Frederick L. Graf (the "ALJ") presided over the hearing on July 14, 2005; no medical or vocation experts were present.  (R. 404-14.)  At the hearing, the ALJ initiated discussion of Ms. Earnest's impairments by referring to an exhibit "indicating a primary diagnosis of fibromyalgia and a secondary diagnosis of other disorders of the ear."  (R. 404.)  Ms. Earnest then testified regarding several medical conditions: muscle and tissue pain due to fibromyalgia, joint pain due to arthritis, bursitis in her hips (recurrent trochanteric bursitis), and hearing loss (a condition for which she had previously received disability benefits).  (R. 404-14.)

In response to questions concerning the pain caused by fibromyalgia, Ms. Earnest testified that the pain prevented her from fully functioning in the household on

---

[3]  The Administrative Record ("R.") in this case consists of one volume, pp. 1-413.

most days.  (R. 407-08.)  Asked to rate the pain on a scale from 1 to 10, Ms. Earnest

testified that it was sometimes a 9 or 10, and at those times, "I can't stand, I can't sit, I

can't sleep, I can't – you know, and I've taken the medications and all I can do is cry."

(R. 408-09.)  She testified that she took four to six 500-milligram tablets of hydrocone

per day in order to relieve pain, and that the medication sometimes reduced her pain to

a "tolerable" level (6 or 7 on a scale of 1 to 10).  (*Id.*)  However, she testified the

medication sometimes failed to provide any pain relief and that it caused side effects,

including drowsiness and difficulty remaining fully aware and alert.  (*Id.*)

Asked whether she could perform a secretarial-type job over the course of an

eight-hour day, including tasks such as typing and filing, Ms. Earnest testified that she

could not.  (R. 409.)  She explained that she would be unable to remain seated for an

extended period of time without changing positions and that she would need to take

pain medication, which would cause drowsiness.  (*Id.*)  She further explained that she

would have great difficulty bending up and down to file, that she could not remain bent

over for any significant period of time, and that the arthritis in her hands and joint pain in

her elbows would limit her ability to write or type.  (R. 409-10.)

Asked about the bursitis in her hips (recurrent trochanteric bursitis), Ms. Earnest

testified that she had lost a significant amount of weight (approximately 69 pounds) in

an effort to relieve pain attributable to that condition, but the pain had persisted.  (R.

410.)  She had undergone surgery to remove the bursa sac from her left hip, but the

surgery had not alleviated any of her pain.  (R. 410-11.)  She estimated that she could,

in an average day, sit continuously for only 20 minutes and stand continuously for only

15 minutes.  Further, she testified that she could not alternate between these two positions over the course of an eight-hour day, because she would sometimes need to go from sitting to laying down.  (R. 411.)

Ms. Earnest also testified that she required assistance from her two children and her husband in order to perform housework.  (R. 412.)  Because of her inability to go up and down the steps, she and her husband had sold their two-story home of 12-1/2 years and moved into a ranch-style home.  (*Id.*)

Asked about her hearing loss, Ms. Earnest testified that at one time, she had been very close to being "profoundly deaf."  (R. 407.)  She had previously received disability insurance benefits for this condition from June 8, 1998 to August 23, 1999.  (R. 405.)  She opted for a course of high-dosage steroid treatment in order to treat the condition.  (R. 407.)  The high-dosage steroid treatment had improved her condition to the point that she did not need to wear a hearing aid, provided that she could see the person speaking to her.  (R. 407.)  However, she noted that her phone was equipped with a volume button, and she stated, "I'm sure I miss out on a lot that's going on."  (*Id.*)  She also testified that she had "been told" that the high-dosage steroid treatment for hearing loss had caused her other problems with fibromyalgia and arthritis.  (R. 406.)

Exhibits received as evidence at the hearing before the ALJ included (1) reports from two consultative examinations; (2) an RFC assessment completed (partly in reliance on the results of the two consultative examinations) by two state agency physicians in June and September 2004; (3) separate RFC assessments performed by

two of Ms. Earnest's treating physicians in May and June 2005; (4) a Fibromyalgia Syndrome Medical Assessment Form completed by Mr. Earnest's rheumatologist in June 2005; and (5) extensive documentation of Ms. Earnest's treatment history from several physicians, including her family physician (Dr. Bradley Guill), her rheumatologist (Dr. Douglas Smith), and her orthopaedic specialist (Dr. Richard Eaton).  (R. 404-05.)

Dr. M. Hays performed the first consultative examination on June 1, 2004.  (R. 206.)  His report describes an impression of lower back pain, bilateral hip pain, and fibromyalgia.  In addition, he stated that Ms. Earnest's "chronic back and hip pain combined with fibromyalgia seems to be limiting [her] ability to stand, walk, and lift for long times."  He found that she "may be able to do sitting down jobs to some extent provided that she takes breaks in between."  (R. 207-08.)

Dr. Jack Summerlin performed the second consultative examination, primarily for hearing loss, on June 4, 2004.  He found that Ms. Earnest had "mild sloping to moderately severe mid to high frequency sensorineural hearing loss rising to moderate loss in 4000-8000 Hz range bilaterally" and recommended "hearing aid usage and preferential seating," along with follow-up audiometry in 6-12 months.  (R. 200-01.)

Relying in part on these reports and on the record as it existed at that time, state agency physicians Dr. L. Bastnagel and Dr. J. Sands completed an RFC assessment in June 2004 and September 200 respectively.  (R. 192-99.)  They found that Ms. Earnest could lift and/or carry (including upward pulling) up to 50 pounds occasionally and up to 25 pounds frequently.  ( R. 193.)  They found that, over the course of an eight-hour

workday with normal breaks, she could stand and/or walk for about 6 hours and sit for about 6 hours.  (*Id.*)  They listed as support for these conclusions Dr. Hays' findings of: (1) blood pressure of 143/92; (2) weight of 180 pounds; (3) height of 5 feet 2 inches; (4) normal gait and station; (5) full range of motion in most of her joints; (6) motor strength of "5/5"; and (7) normal sensation.  (*Id.*)  They found that she had no significant postural limitations, including limitations related to climbing stairs or stooping, and that she had no environmental, manipulative, visual, or communicative limitations (including any hearing limitation).  (R. 193-96.)  Their report did not mention any other symptoms alleged by Ms. Earnest to produce physical limitations, and the report was not based on the statement of any treating or examining source regarding Ms. Earnest's physical capacities.  (R. 198.)

The RFC assessments completed by Ms. Earnest's family physician (Dr. Bradley Guill) and her rheumatologist (Dr. Douglas Smith) in May and June 2005 concluded that Ms. Earnest's limitations were more severe; however, the two assessments were not entirely consistent in their conclusions.  For example, both physicians found that she could lift up to 10 pounds only occasionally, and both found that she could never lift more than 20 pounds; however, Dr. Smith found that she could occasionally lift 11 to 20 pounds, while Dr. Guill found that she could never lift items in excess of 10 pounds.  (R. 342, 277.)  Both physicians found that subjective symptoms such as pain, fatigue, and abnormal sensation would limit Ms. Earnest's ability to perform nonexertional functions (such as concentration, regular attendance at work, and maintaining reasonable relationships with supervisors and co-workers).  However, Dr. Guill concluded that these

6

limitations would be moderately severe (defined as "an impairment which seriously affects ability to function"), whereas Dr. Smith concluded that these limitations would be moderate (defined as "an impairment which affects but does not preclude ability to function"). (R. 344, 378.) Both physicians found greater limitations in Ms. Earnest's ability to sit and stand continuously than indicated by the report of the state physicians. Dr. Guill found that Ms. Earnest would need to change positions after sitting for 1/2 to 3/4 of an hour and after standing for 1/2 to 3/4 of an hour, whereas Dr. Smith found that she would need to change positions after sitting for just 1/2 hour and after standing for 1/4 hour; both physicians found that she would need to change positions after walking for 1/2 hour. (R. 342, 377.) Dr. Guill found that, over the course of an 8-hour workday, Ms. Earnest would be able to sit for no more than 4-5 hours, stand for no more than 3-4 hours, and walk no more than 2 hours; Dr. Smith found that she would be able to sit for no more than 4 hours, stand for no more than 2 hours, and walk for no more than 2 hours. (R. 342, 377.)

The most striking difference between the two physicians' reports involved their assessments of Ms. Earnest's ability to use her hands and feet for "frequent" or "continual" repetitive action or movements. Whereas Dr. Guill found no restrictions in this respect, Dr. Smith found that Ms. Earnest would not be able to use her right or left hand for simple grasping, pushing and pulling of arm controls, or fine manipulation in the course of frequent or continual repetitive action; in addition, he found that she would not be able to use her feet for frequent or continual repetitive movements. (R. 343, 378.) Both physicians based their conclusions on clinical observations and the patient's

7

subjective complaints, and Dr. Smith also listed "objective testing" as a basis for his conclusions.  ( R. 344, 379.)  Dr. Guill listed diagnoses of arthritis and recurrent trochanteric bursitis, whereas Dr. Smith listed diagnoses of fibromyalgia, osteoarthritis, and sensorineural hearing loss.  (*Id.*)

The exhibits also include a "Fibromyalgia Syndrome Medical Assessment Form" completed by Dr. Smith on June 30, 2005.  Dr. Smith described Ms. Earnest's prognosis as "fair" and listed other diagnoses of chronic fatigue syndrome, osteoarthritis, and autoimmune sensorineural hearing loss.  (R. 380.)  He indicated that Ms. Earnest met the 1990 diagnostic criteria for fibromyalgia syndrome identified by the American College of Rheumatology, including the presence of multiple tender points.  (*Id.*)  Dr. Smith's report indicated that she experienced pain in her fingers, elbows, shoulders, hips, and feet.  (R. 380-81.)  He also indicated that she would "rarely" be able to twist or bend over (stoop).  (R. 383.)  Dr. Smith estimated that, over the course of an 8-hour workday, Ms. Earnest would be able to use her hands to grasp, turn, or twist objects only 25% of the time, use her fingers for fine manipulations only 50% of the time, and use her arms for reaching only 10% of the time.  (R. 384.)  Dr. Smith also stated that Ms. Earnest would experience symptoms interfering with "the attention and concentration needed to perform even simple work tasks" during an average workday "at least frequently," defined as "34% to 66% of an eight-hour workday."  (R. 381.)  Dr. Smith estimated that she would likely be absent from work more than four days per month due to her impairments.  (R. 384.)  The report concluded that Ms. Earnest would have serious difficulty remembering and executing even simple instructions and that she

8

would be "unable to meet competitive standards" in performing "routine repetitive work at a consistent pace without an unreasonable number and length of rest periods."  (R. 385.)

Ms. Earnest's treatment relationship with Dr. Smith began on April 30, 1998; she had begun treatment with another physician at his rheumatology clinic in 1996. (R. 238.)  Ms. Earnest continued to see Dr. Smith regularly through at least May 4, 2005.  (R. 210-35, 386-401.)  Dr. Smith's treatment notes first indicate a diagnosis of fibromyalgia on November 23, 1999, and this diagnosis reappears in many, although not all, of his subsequent reports documenting her office visits.  (R. 211-13, 219A, 221-25, 227, 386, 391, 400-01.)  Although her symptoms varied over time in nature and severity, Ms. Earnest consistently sought treatment for pain, and she frequently indicated that hip pain was her most severe problem.  (R. 210-35, 386-401.)  Dr. Smith's records from the course of her treatment history list a number of diagnoses, including (but not limited to) fibromyalgia, recurrent trochanteric bursitis, mild bilateral hip osteoarthritis, autoimmune sensorineural hearing loss, and polyarthralgia.  (*Id.*)  Ms. Earnest tried a number of pain medications during this time period, including Celebrex, Vioxx, Bextra, Darvocet, Vicodin (hydrocone), and Lodine.  (*Id.*)  She also received bilateral hip injections to relieve her hip pain on several occasions.  (R. 214-18, 223-24.)  In several office visits, Ms. Earnest described her pain as an 8 or 9 on a scale of 1 to 10.  (R. 213, 217, 218, 391, 400, 401.)  Ms. Earnest also experienced sleep difficulties due to her chronic pain and took Ambien to address this problem.  (R. 386.)

**B.     ALJ's Decision**

9

The ALJ issued a decision on August 11, 2005, finding that Ms. Earnest was not "disabled" within the meaning of the Social Security Act. The ALJ performed the five-step sequential analysis dictated by 20 C.F.R. § 404.1520 to determine whether Ms. Earnest was disabled. (R. 14.) First, the ALJ found that Ms. Earnest had not engaged in substantial gainful activity since her alleged onset date. (*Id.*) Second, the ALJ found that Ms. Earnest's hip condition (recurrent trochanteric bursitis) constituted a "severe" impairment within the meaning of the Regulations. He noted that 20 C.F.R. § 1523 requires consideration of all medically determinable impairments throughout the remainder of the sequential analysis, but he failed to mention any of Ms. Earnest's other impairments, such as hearing loss or fibromyalgia, either at this stage or in the remainder of his decision. (R. 14-15.) At step three, the ALJ found that Ms. Earnest's recurrent trochanteric bursitis did not "meet or medically equal, either singly in combination . . . one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." (R. 15.) Before performing steps four and five, the ALJ assessed Ms. Earnest's residual functional capacity ("RFC"). In making this assessment, the ALJ found that Ms. Earnest's claims of disabling pain were not credible because "her hip range of motion is normal and she tolerates medication without side effects," and because her bursitis was clinically described as "minimal." (R. 15.) The ALJ gave "no weight" to two "checklist-style" RFC assessments by Ms. Earnest's treating physician, stating that "they are unsupported by the record and rely largely on the claimant's own exaggerated claims of debilitating pain." (*Id.*) The ALJ concluded that Ms. Earnest could perform sedentary work, and at step four, he found that she could not perform her past relevant work as a beautician. (R. 15.) Finally, the ALJ applied Medical-Vocational Rule 201.21, taking

10

into consideration Ms. Earnest's RFC, age, education, and work experience, to direct a conclusion that she was not disabled.  (R. 16.)  The Appeals Council declined review of the ALJ's determination, making it the Commissioner's final decision.

## II.    Applicable Law

### A.  Disability Determinations Under the Social Security Act

To qualify for disability insurance benefits under the Social Security Act, a claimant must be "disabled."  42 U.S.C.  § 423(a)(1)(E).  An individual is "disabled" within the meaning of the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  She must demonstrate that her "impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The Social Security regulations prescribe a sequential five-step process to determine whether a claimant is disabled.  This test directs the Commissioner to determine:  (1) whether the claimant is presently engaged in "substantial gainful activity"; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether the claimant's impairment meets or equals any

11

impairment listed in the Regulations as being sufficiently severe to preclude substantial gainful activity; (4) if not, whether the claimant's residual functional capacity allows her to perform her past relevant work; (5) if not, whether the claimant is unable to adjust to any other work existing in significant numbers in the national economy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citing 20 C.F.R. §§ 404.1520(a)-(f), 416.920).  The claimant bears the burden of proof at steps one through four; however, if the analysis reaches step five, then the burden of proof shifts to the Commissioner.  *Id.* (citing *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004)).  An affirmative answer at step three or step five will result in a finding that the claimant is disabled.

### B.  Standard of Review

The Social Security Act limits the scope of judicial review of final decisions of the Commissioner.  *See* 42 U.S.C. § 405(g).  This court must uphold the Commissioner's (and therefore the ALJ's) decision so long as it is "both supported by substantial evidence and based on the proper legal criteria."  *Briscoe ex rel. Taylor*, 425 F.3d at 351 (quoting  *Scheck v. Barnhart,* 357 F.3d 697, 699 (7th  Cir. 2004)) (quotations marks omitted).  "Substantial evidence" requires more than a mere scintilla of proof, but is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Scheck*, 357 F.3d at 699 (quotation marks omitted).  Even if an alternative conclusion is also supported by substantial evidence, the ALJ's decision must stand where it is supported by substantial evidence.  *Id.* (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).  This court may not substitute its own judgment for

12

that of the ALJ by "reconsidering facts, reweighing evidence, resolving conflicts in evidence or deciding questions of credibility."  *Williams v. Apfel*, 179 F.3d 1066, 1071-72 (7th Cir. 1999) (quoting *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)) (quotation marks omitted).

Although this standard of review commands significant deference to the ALJ's findings, this deference is not unlimited.  "When an ALJ denies benefits, he must build an 'accurate and logical bridge from the evidence to his conclusion.'"  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).  Therefore, this court must "conduct a critical review of the evidence, considering both the evidence that supports, as well as the evidence that detracts from, the [ALJ's] decision."  *Briscoe ex rel. Taylor*, 425 F.3d at 351 (quoting *Lopez ex rel. Lopez*, 336 F.3d at 539) (quotation marks omitted).  The ALJ's decision cannot stand if it lacks evidentiary support, fails to adequately discuss the issues, or is "so poorly articulated as to prevent meaningful review."  *Id.*; *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Although the ALJ need not provide a written evaluation of every piece of evidence and testimony in his decision, "meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence"; therefore, the ALJ may not "select and discuss only that evidence that favors his ultimate conclusion."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  Rather, in considering all relevant evidence, the ALJ must "confront evidence that does not support his conclusion and explain why it was rejected."  *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002).

13

## III.    ANALYSIS

Ms. Earnest requests reversal of the ALJ's decision and a finding that she is
entitled to disability insurance benefits; alternatively, she requests that the case be
remanded for further administrative proceedings.  Ms. Earnest argues that the ALJ
erred by: (1) failing to adequately discuss evidence of her impairments, giving no weight
to the opinion of her treating physician, and failing to perform a function-by-function
assessment of her residual functional capacity; (2) failing to discuss whether her
recurrent trochanteric bursitis specifically satisfied the requirements of Listing 1.02A;
and (3) applying the Medical-Vocational Rules (the "Grids") to direct a conclusion that
she was not disabled despite the presence of significant nonexertional impairments.
Each argument is addressed below.

> **A.    The ALJ Erred in Assessing Ms. Earnest's Credibility, Giving No
> Weight to the Opinion of Ms. Earnest's Treating Physician, and
> Failing to Perform the Required Steps in the RFC Assessment
> Process.**

> > **1.    The ALJ Failed to Comply with SSR 96-7p and Relevant
> > Seventh Circuit Case Law in Evaluating the Credibility of
> > Ms. Earnest's Complaints of Disabling Pain.**

Ms. Earnest contends that the ALJ erred by failing to adequately consider or
even ignoring evidence of some of her impairments in determining that her claims of
disabling pain were not credible.  In evaluating Ms. Earnest's credibility, the ALJ
properly cited the applicable standards from 20 C.F.R. § 404.1529 and SSR 96-7p
before finding that Ms. Earnest's claims of disabling pain were not credible.  In support

of his conclusion, the ALJ noted exhibits indicating Ms. Earnest's normal hip range of motion, her ability to tolerate certain pain medication, and a clinical description of her bursitis as "minimal."  (R. 15.)

In assessing the credibility of a claimant's statements regarding symptoms, the ALJ must comply with Social Security Ruling 96-7p.  *See Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) (stating that "in evaluating the credibility of statements supporting a Social Security application . . . an ALJ must comply with the requirements of Social Security Ruling 96-7p").  This Ruling explains the two-step process prescribed by 20 C.F.R. § 404.1529 for the evaluation of a claimant's symptoms.  First, the ALJ must determine "whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the individual's pain or other symptoms," without regard for the intensity, persistence, or physically limiting effects of such symptoms.  If there is no such underlying impairment that could produce the claimant's symptoms, then the claimant's symptoms cannot be found to affect her ability to work.  SSR 96-7p; 20 C.F.R. § 404.1529(a), (b).  However, where such an impairment exists, the ALJ must proceed to the second step, which requires an evaluation of the intensity, persistence, and limiting effects of the claimant's symptoms.  SSR 96-7p; 20 C.F.R. § 404.1529(c).

Because symptoms are inherently subjective and difficult to quantify, the Regulations provide a process for evaluating "a greater severity of impairment than can be shown by objective medical evidence alone."  20 C.F.R. § 404.1529(c)(3).  Where the objective medical evidence alone cannot fully substantiate the claimant's statements

concerning the intensity, persistence, or limiting functional effects of symptoms, then the ALJ must assess the credibility of the claimant's statements.  SSR 96-7p; 20 C.F.R. 404.1529(c).  This requires the ALJ to consider the claimant's statements in light of all the evidence, including the objective medical evidence, information about the claimant's prior work record, evidence submitted by the claimant's treating physicians, and observations by other persons.  *Id.*  The ALJ must pay particular attention to the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to relieve pain or other symptoms; (5) any treatment aside from medication that the claimant receives or has received to relieve symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms, such as lying flat on her back or changing positions at certain intervals; (7) any other relevant factors concerning limitations imposed by pain or other symptoms.  SSR 96-7p; 20 C.F.R. 404.1529(c). The goal of this analysis is to determine the extent to which the claimant's "alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record." SSR 96-7p.

The ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons

for that weight." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (quoting SSR 96-7p) (quotation marks omitted).  A "single, conclusory statement" regarding the claimant's credibility is not sufficient, and the ALJ may not simply recite factors from the regulations in making this determination.  *Id.*  Where medical evidence in the record provides support for a claimant's complaints of disabling pain, the ALJ must explain why the claimant's statements were rejected.  *See id.* at 888 (holding that the ALJ erred in failing to consider medical evidence supporting the claimant's claim of disabling pain in assessing the credibility of claimant's statements); *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003); *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2001).  The ALJ "need not totally accept or totally reject the individual's statements," but instead "may find all, only some, or none of an individual's allegations to be credible."  SSR 96-7p.

In Ms. Earnest's case, the ALJ's discussion of the credibility of her claims of disabling pain reads in its entirety:

> The claimant's allegations of disabling pain are not credible.  She frequently assesses her pain at 8 or 9 on a scale of 1-10, but her hip range of motion is normal and she tolerates pain medication without side effects.  Two checklist-style residual functional capacity assessments by the claimant's treating physician indicate that the claimant cannot work.  The undersigned gives these assessments no weight, however, because they are unsupported by the record and rely largely on the claimant's own exaggerated claims of debilitating pain.  The claimant's bursitis is clinically described as "minimal."

(R. 15) (internal citations omitted).  The ALJ's perfunctory analysis fails to satisfy the requirements of SSR 96-7p and relevant Seventh Circuit case law.

First, the ALJ erred by "select[ing] and discuss[ing] only that evidence that favors his ultimate conclusion," *Herron*, 19 F.3d at 333, and by failing to "confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky*, 335 F.3d at 543.  Even without considering the two RFC assessments completed by Ms. Earnest's treating physicians (Dr. Smith and Dr. Guill) or the Fibromyalgia Syndrome Medical Assessment Form completed by Dr. Smith, the record is replete with evidence not confronted by the ALJ that tends to support the credibility of her statements:  (1) Ms. Earnest's consistent efforts since 1999 to obtain pain relief through visits to medical specialists (including a rheumatologist and an orthopaedic specialist), a variety of pain medications prescribed by her physicians, bilateral hip injections, and even hip surgery; (2) her treating physicians' diagnoses of fibromyalgia and various arthritic conditions; (3) treatment reports from Ms. Earnest's rheumatologist (Dr. Smith) documenting a history of complaints of severe pain dating back to at least 1999; and (4) Ms. Earnest's own testimony regarding her need to frequently change positions to relieve pain and limitations on her daily activities resulting from her impairments.  Rather than considering this evidence and providing specific reasons for finding it unpersuasive, as required by SSR 96-7p and Seventh Circuit case law, the ALJ simply omitted any discussion of this evidence in assessing Ms. Earnest's credibility.

The ALJ also erred in his credibility determination by failing to discuss evidence of fibromyalgia as a possible source of Ms. Earnest's pain; indeed, the ALJ's decision does not even mention the word "fibromyalgia," despite the following facts: (1) Ms. Earnest listed fibromyalgia as her disabling condition in her original application for

18

benefits; (2) the record contains extensive medical documentation relating to this condition, including repeated diagnoses of this condition by Ms. Earnest's rheumatologist; and (3) Ms. Earnest testified at some length regarding the limiting effects of this condition at her hearing before the ALJ.  Nevertheless, the ALJ described Ms. Earnest's impairment only as "recurrent trochanteric bursitis" and never even mentioned fibromyalgia, thereby ignoring "an entire line of evidence that is contrary to the ruling," and making it "impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence."  *See Golembiewski*, 322 F.3d at 917 (holding that remand was required where the ALJ "improperly ignored three lines of evidence" by failing to discuss limitations arising from three medical conditions); *Zurawski*, 245 F.3d at 888 (holding that the ALJ's credibility determination fell "below the mark" because the ALJ's decision offered "no clue as to whether [the ALJ] *examined* the full range of medical evidence" related to the claimant's claims of disabling pain) (emphasis in original).  The ALJ's failure to discuss fibromyalgia at this stage violated his obligation "to consider the aggregate effect of [the claimant's] entire constellation of ailments . . . ." *Zurawski*, 245 F.3d at 918 (citing 20 C.F.R. § 404.1523).

The ALJ's failure to discuss critical evidence supporting Ms. Earnest's credibility is only compounded by the unpersuasive reasons actually offered in support of his credibility determination.  Neither the normal range of motion in her hips nor a clinical description of her bursitis as "minimal" necessarily undermines her claims of disabling pain.  Further, the ALJ mischaracterized the evidence in stating that Ms. Earnest tolerated pain medication "without side effects."  (R. 15.)  The exhibit cited by the ALJ in

19

support of this statement, a report from Dr. Smith from May 3, 2004, reveals that although Ms. Earnest tolerated one pain medication (Vioxx) without side effects at that time, she did experience drowsiness as a result of another pain medication (Vicodin). (R. 100.)  In addition, the ALJ's statement regarding side effects ignores Ms. Earnest's testimony that she suffers from drowsiness and awareness/alertness difficulties as side effects of her current pain medication.  (R. 408.)

In short, the ALJ's failure to consider evidence contrary to his credibility determination and to perform the sort of analysis dictated by SSR 96-7p necessitates remand.  On remand, the ALJ must properly assess the credibility of Ms. Earnest's claims in light of all the relevant evidence, including all of her medical conditions (particularly fibromyalgia).  *See Zurawski*, 245 F.3d at 888 ("We are not suggesting that the ALJ's credibility determination was incorrect, but only that greater elaboration is necessary.  Accordingly, the ALJ must conduct a reevaluation of [the claimant's] complaints of pain with due regard for the full range of medical evidence.")   On remand, the ALJ should carefully consider not only the full range of medical evidence, but also all other relevant evidence, particularly in light of the seven factors identified in SSR 96-7p and 20 C.F.R. 404.1529(c) for the assessment of a claimant's credibility.

### 2.    The ALJ Erred in Giving No Weight to the Opinion of Ms. Earnest's Treating Physician.

The ALJ also erred in giving "no weight" to the opinion of Ms. Earnest's rheumatologist, Dr. Smith.  The ALJ explained:

Two checklist-style residual functional capacity assessments by the

20

> claimant's treating physician indicate that the claimant cannot work.  The undersigned gives these assessments no weight, however, because they are unsupported by the record and rely largely on the claimant's own exaggerated claims of debilitating pain.

(R. 15) (internal citations omitted).

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870 (citing 20 C.F.R. § 404.1527(d)(2)).  Where a treating physician's medical opinion is inconsistent with other substantial evidence in the record, the ALJ should not give the opinion controlling weight.  SSR 96-2p.  However, even where an opinion is not entitled to controlling weight, the ALJ is not free to simply disregard it; "treating source opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 . . . ."  SSR 96-2p.  These factors include: (1) whether the opinion is that of an examining source; (2) the length of the treatment relationship and frequency of examination; (3) the nature and extent of the treatment relationship; (4) supportability, based on the evidence and explanations provided; (5) consistency with the record as a whole; (6) whether the opinion is that of a specialist with respect to the relevant medical issues; and (7) other factors that may tend to support or contradict an opinion.  20 C.F.R. § 404.1527(d).  Where the ALJ denies benefits, his decision must provide sufficiently specific reasons, supported by the evidence in the case record, for the weight given to a treating physician's medical opinion.  SSR 96-2p; 20 C.F.R. § 404.1527(d).  In many cases where a treating physician's opinion does not meet the test

for controlling weight, it still "will be entitled to the greatest weight and should be adopted."  SSR 96-2p.

The ALJ failed to comply with 20 C.F.R. § 404.1527 and SSR 96-2p in giving "no weight" to Dr. Smith's opinion regarding the nature and severity of Ms. Earnest's symptoms.  The ALJ failed to explain how Dr. Smith's opinion was inconsistent with other evidence in the case record; although there are other medical opinions (including those of state agency physicians) in the record that are somewhat inconsistent with Dr. Smith's findings, the ALJ did not cite to any such medical opinions or reports in explaining why he discounted the opinion of Dr. Smith.  Therefore, he impermissibly "substitute[d] his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."  *See Clifford*, 227 F.3d at 870 (holding that the ALJ erred by rejecting a treating source opinion without relying on other medical evidence or authority in the record).  In addition, he failed to consider factors tending to support Dr. Smith's opinion, such as his lengthy treatment relationship (more than five years) with Ms. Earnest and his specialization as a rheumatologist, as required by 20 C.F.R. § 404.1527.  These failures also require a remand of this claim.[4]

---

[4] It should be noted that the ALJ also failed to explain the weight given to the opinions from state agency physicians  (such as the RFC assessment completed by Dr. Bastnagel and Dr. Sands).  *See* 20 C.F.R. § 404.1527(f) ("Unless the treating source's opinion is given controlling weight, the [ALJ] must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician . . . as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources . . . .").  SSR 96-6p explains how the ALJ should evaluate the weight to be given to any state agency physicians' medical opinions.  Such opinions are to be treated as the opinions of nonexamining physicians, and their findings can be given weight "only insofar as they are supported by evidence in the case record."  SSR 96-6p.  SSR 96-6p provides further detail on the

3.      The ALJ Erred in Failing to Provide a Function-by-Function
        Analysis and Narrative Discussion Explaining His RFC
        Assessment.

The ALJ also erred in failing to perform the required function-by-function analysis and provide a narrative discussion explaining his RFC assessment.  After rejecting Ms. Earnest's claims of disabling pain, the ALJ stated:  "Accordingly, the undersigned finds the claimant can do sedentary work."  (R. 15.)  This conclusory determination does not meet the requirements of 20 C.F.R. § 404.1545 and SSR 96-8p.

Residual functional capacity (RFC) is an administrative assessment by the ALJ that represents the claimant's maximum ability to perform work activities, despite her limitations, "in an ordinary work setting on a regular and continuing basis," meaning "8 hours a day, 5 days a week, or an equivalent work schedule."  SSR 96-8p.  The RFC assessment is used at step four of the sequential evaluation process to determine whether the claimant can perform her past relevant work and, if necessary, at step five to determine whether the claimant can adjust to any other work that exists in the national economy.  *Id.*  Only those limitations that result from medically determinable impairments should be considered, but all such impairments must be considered by the ALJ in assessing a claimant's RFC.  20 C.F.R. § 404.1545; SSR 96-8p.  The RFC assessment should be based on all relevant information in the record, including the claimant's medical history, symptoms, reports of daily activities, effects of treatment, and medical opinions from the claimant's treating physicians or other sources regarding

_____

circumstances under which a state agency physician's opinion may be entitled to greater weight than that of a treating physician.

what the individual can still do despite her impairments.  SSR 96-8p.

In assessing a claimant's RFC, the ALJ must first "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including her physical abilities, mental abilities, and other abilities, such as sensory abilities.  SSR 96-8p; 20 C.F.R. §§ 404.1545(b)-(d).  Only after the completion of such function-by-function analysis "may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p.  Function-by-function assessment is essential because an individual can only be classified as capable of performing a given exertional level, such as sedentary work, if "the individual [is] able to perform substantially all of the exertional and nonexertional functions required in work at that level."  *Id.*

The RFC assessment must address both exertional and nonexertional capacities of the claimant.  SSR 96-8p.  Exertional capacities include the individual's ability to perform "each of the seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling"; each of these functions must be considered separately.  *Id.* Nonexertional capacity involves an assessment of an individual's work-related abilities that do not depend on physical strength, such as postural, manipulative, visual, communicative (hearing, speaking), and mental abilities.  *Id.*  The RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . ."  *Id.*  The ALJ must describe the maximum amount of each work-related activity the individual can perform in an ordinary work setting on a regular and continuing basis (8 hours per day,

24

5 days per week, or an equivalent work schedule).  *Id.*  Where the individual alleges

subjective symptoms, such as pain, the ALJ must thoroughly discuss and analyze the

objective medical and other evidence, resolve any inconsistencies in the evidence, and

"set forth a logical explanation of the effects of symptoms, including pain, on the

individual's ability to work."  *Id.*

The ALJ's RFC analysis suffers from the same deficiencies as his assessment of

Ms. Earnest's credibility and the weight to give her treating physician's opinion: the ALJ

cited only that evidence which favored his conclusion and disregarded extensive

evidence in the record (such as Dr. Smith's opinion regarding Ms. Earnest's work-

related limitations) that might have undermined that conclusion.  *See Zurawski*, 245

F.3d at 888 (holding that remand was proper where the ALJ failed to consider evidence

contrary to his conclusion in assessing the claimant's RFC).  In addition, the ALJ failed

to either perform a function-by-function analysis of Ms. Earnest's remaining capacities

or provide a narrative discussion explaining his conclusions, in violation of the

requirements of SSR 96-8p.  *See Briscoe ex rel. Taylor*, 425 F.3d at 352 (stating that

the ALJ's omission of the narrative discussion required by SSR 96-8p is sufficient to

warrant reversal of the ALJ's decision).  The previously-discussed errors by the ALJ in

assessing Ms. Earnest's credibility and the weight accorded to her treating physician's

opinion compound the flawed RFC analysis, because both her statements regarding the

limiting effects of her symptoms and her treating physician's opinion are factors that

should be considered in the RFC analysis.  *See* 20 C.F.R. 1545(a)(3); SSR 96-8p.  In

addition, the ALJ erred by failing to consider evidence of fibromyalgia or hearing loss,

because he is required to consider evidence of all Ms. Earnest's impairments in making

the RFC assessment.  These errors deprive the ALJ's conclusions of the necessary

logical bridge from the evidence to the negative result.

**B.    Listing 1.02A.**

Ms. Earnest also argues that the ALJ erred in failing to discuss her condition in

light of Listing 1.02A.  The ALJ's discussion of the Listing reads as follows:

> The claimant has a history of bilateral hip pain that has been treated
> conservatively, with injections and pain medication.  She has no radicular
> symptoms and surgery has been ruled out.  Radiographs show minimal
> degenerative disease in both hips.  The claimant nonetheless complains of
> high levels of constant pain.  The medical evidence indicates that the
> claimant has recurrent trochanteric bursitis, an impairment that is "severe"
> within the meaning of the Regulations but not "severe" enough to meet or
> medically qual, either singly or in combination to one of the impairments
> listed in Appendix 1, Subpart P, Regulations No. 4.

(R. 14-15) (internal citations omitted).

The Seventh Circuit has held that "where an ALJ omits reference to the

applicable listing and provides nothing more than a superficial analysis, reversal and

remand is required."  *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (citing and

distinguishing *Brindisi v. Barnhart*, 315 F.3d 783, 786-87 (7th Cir. 2002)).  In *Rice*, the

court distinguished *Brindisi*, pointing out that although the ALJ did not mention the

specific relevant listing, he did not perform the sort of fatally "perfunctory" analysis of the

claimant's impairments that the court found erroneous in *Brindisi*.  The *Rice* ALJ

discussed the claimant's severe impairments in detail, summarized the opinions of two

26

physicians, discussed her medications and other treatments, recounted the course of her physical therapy, summarized her subjective statements, and assessed her credibility. *Rice*, 384 F.3d at 370.

The current case seems closer to the facts of *Brindisi*, where the ALJ merely listed the claimant's severe impairments and concluded that he did not meet any of the Listings. *Brindisi*, 315 F.3d at 786. However, because remand is necessary for the reasons discussed in the preceding sections, it is not necessary to decide whether the ALJ erred in failing to analyze Ms. Earnest's impairments in light of Listing 1.02A at this time; on remand, the ALJ should have the opportunity to review and discuss the medical evidence more thoroughly in reevaluating both Ms. Earnest's credibility and the weight to be given to her treating physician's opinion.

### C.     Whether Consultation With a Medical-Vocational Expert is Required at Step Five.

Ms. Earnest contends that the ALJ also erred by applying the Medical-Vocational Guidelines (the "Grids") at step five of the sequential analysis to direct a conclusion that she was not disabled. The ALJ relied on Medical-Vocational Rule 201.21 in concluding that, in light of Ms. Earnest's age, education, vocationally relevant past work experience, and RFC, she was "not disabled" within the meaning of the Social Security Act at any time through the date of the ALJ's decision. (R. 16.) Ms. Earnest argues that the ALJ erred because she suffered from nonexertional impairments that should have precluded dispositive use of the Grids.

Because the Grids generally take account only of exertional impairments, use of the grids is inappropriate "where a nonexertional limitation might substantially reduce the range of work an individual can perform," and in such circumstances, the ALJ must consult a vocational expert. *Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005) (citing *Zurawski*, 245 F.3d at 889). Nonexertional impairments do not depend on the claimant's physical strength; such impairments may involve postural or manipulative functions (reaching, handling, stooping, or crouching), difficulty in seeing or hearing, difficulty in maintaining attention or concentrating, the ability to tolerate various environmental factors, or other mental limitations (such as anxiety or depression). 20 C.F.R. § 1569a(c); SSR 96-8p.

Ms. Earnest presented evidence and testified that she suffered from several impairments that would be classified as nonexertional; these include hearing loss, difficulty with alertness or concentration due to the side effects of her medication, as well as postural and manipulative limitations documented by Dr. Smith in his RFC assessment. Because this court has already directed the ALJ to reevaluate evidence of Ms. Earnest's credibility, the weight given to the opinion of her treating physician, and her residual functional capacity, "it would be premature to direct the ALJ to solicit vocational testimony from an expert." *See Zurawski*, 245 F.3d at 889. On remand, the ALJ should carefully consider evidence of Ms. Earnest's nonexertional impairments and remain cognizant of the law of the Seventh Circuit, which precludes reliance on the Grids and requires the ALJ to consult a vocational expert where nonexertional limitations might substantially reduce the range of work an individual can perform.

28

**IV.     Conclusion**

For the reasons stated above, the ALJ's decision of August 11, 2005 did not build an "accurate and logical bridge" between the evidence and ultimate conclusion, and therefore, it is impossible for this court to determine whether the evidence was supported by "substantial evidence."  Therefore, this claim is remanded to the Commissioner for reconsideration in a manner consistent with this entry.

ALL OF WHICH IS ENTERED this 28th day of September 2007.

_____

John Daniel Tinder, Judge
United States District Court

Copies to:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov